# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ROSEMARY MILLER,**

      **Plaintiff,**

      **v.**                                                    **Case No. 14-2596-JAR-TJJ**

**BNSF RAILWAY COMPANY,**

      **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Rosemary Miller, who suffers from bipolar disorder and adult attention deficit disorder, brings this action against her former employer, Defendant BNSF Railway Company ("BNSF").  Plaintiff alleges that BNSF's termination of her employment violated the Americans with Disabilities Act, as amended ("ADAA"), the Family and Medical Leave Act, as amended ("FMLA"), the Federal Railroad Safety Act ("FRSA"), and Kansas common law.  This matter is before the Court on BNSF's Motion for Summary Judgment (Doc. 40) on all of Plaintiffs' claims.  For the reasons discussed in detail below, the Court grants BNSF's motion in part and denies it in part.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

jury could return a verdict for the nonmoving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.     Uncontroverted Facts

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

### *Plaintiff's Background*

Plaintiff began her employment with BNSF in December 2010 as a timekeeping clerk in the Mechanical Timekeeping Department at BNSF's Topeka office complex.  In March 2011, Plaintiff transferred from Mechanical Timekeeping to Payroll as a general payroll clerk.  In May 2011, Plaintiff remained in Payroll, but became a garnishment clerk, which she characterized as a "more challenging" position.  Her entire tenure with BNSF was as a "scheduled" employee who was paid by the hour and was a member of a union.

---

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

Plaintiff was one of five garnishment clerks in the department, and reported to supervisor Billie Jean Graham during most of her time in the position.  Plaintiff's duties as a garnishment clerk required her to process payroll garnishments for employee debts, respond to interrogatories, enter garnishment amounts into the payroll system, and respond to questions from employers, creditors, and attorneys.  Some of Plaintiff's work had to be completed within legally imposed deadlines, such as filing answers or responding to interrogatories, and failure to complete such tasks in a timely manner could result in BNSF becoming liable for a portion of the employee's debt.  The mail concerning garnishments and related matters comes into the office between 9:00 and 10:00 a.m. and again between noon and 1:30 p.m.   The entries into BNSF's software program are to be made prior to the close of payroll, which occurs twice a month.   Answers to interrogatories concerning employee garnishments were usually due within ten to fifteen days, generally after the close of payroll.

Plaintiff shares custody of her daughter with her former husband.  Plaintiff's daughter stayed with her on Monday, Tuesday, Friday and the weekend.

### BNSF Rules, Policies, and Procedures Governing Attendance

BNSF rules state that scheduled clerical employees must contact BNSF's Workforce Management ("WFM") group by telephone if the employee is going to miss work, arrive late, or leave early.  If a clerical employee realizes she will be late for her assigned shift, the employee is to notify WFM prior to the start of her shift.  Plaintiff was familiar with the rules and knew how to contact WFM, which is staffed twenty-four hours per day, seven days a week.

Plaintiff was also subject to finance department guidelines for scheduled employees, which stated that three instances of unexcused absences or late arrivals in a six-month period can result in an "investigation."  At BNSF, an investigation is a procedure whereby BNSF allows

scheduled employees and management representatives to offer information to a hearing officer regarding their respective positions pertaining to the incident in question before the officer decides whether to impose discipline.

The guidelines further state that clerical employees can elect to begin their workday at either 7:00, 7:30, 8:00, or 8:30 a.m., and their start time can change with management approval. Clerical employees can also work with their supervisors to make up time missed on any scheduled work day.

BNSF also has a series of Employee Safety Rules ("ESRs") governing its scheduled employees. ESR 28.13 states that employees should comply with instructions from supervisors with proper authority, and that employees must report for duty on time and not be absent from duty without proper authority. Plaintiff was aware of and familiar with the ESRs, and had electronic access to them during her employment.

In March 2011, BNSF issued Clerical Attendance Guidelines (the "Guidelines") applicable to Plaintiff and other clerks, which Plaintiff was familiar with. The Guidelines stress the importance of being at work on a regular basis and on time, and note that being unexpectedly absent or late can cause business problems in the workplace:

> As members of the BNSF community, we all share an obligation to each other to fulfill basic conditions of employment. One of these conditions is regular, punctual attendance at work. The reason is that absenteeism and lateness are costly and disruptive to the company, our customers and other employees. When unplanned absences become too frequent, our community suffers.[16]

The Guidelines further provide that following an excessive number of incidents of absenteeism, which include both unexcused absences and late arrivals, an employee receives coaching and counseling from her supervisor, a verbal exchange that also includes the preparation of a

---

[16]Doc. 40, Ex. 6.

memorandum for the employee to sign and acknowledge.

Following a documented coaching session, BNSF proceeds to progressive discipline with four successive steps:  a formal reprimand, a ten-day record suspension, a twenty-day record suspension, and dismissal.  After the discipline process begins, an employee must go one year without an incident of absenteeism before a prior violation is removed from her record.

### Plaintiff's Absenteeism and Tardiness

In June 2013, Plaintiff asked to speak with her supervisor, Graham, after Plaintiff had been late for work three times in a three-week period.  Plaintiff acknowledged to Graham that it was not acceptable to be late for work, and that she had asked a friend to call her in order to ensure that she woke up on time to be at work by her 7:00 a.m. starting time.  During the meeting, Graham suggested Plaintiff move her start time to 7:30 a.m., and Plaintiff agreed to do so effective immediately.  Graham also told Plaintiff she was "close" to the acceptable limits for absenteeism events and that her attendance needed to improve.  That same day, Plaintiff exchanged emails with Cinda Beatty, a WFM manager, seeking assistance with "personal issues" that were affecting her ability to get to work on time.  Beatty responded by providing contact information for BNSF's Employee Assistance Program and information regarding the process for seeking time off under the FMLA.

On July 11, 2013, Plaintiff arrived late for her shift due to a traffic issue.  Plaintiff apologized to Graham, who decided to move forward with the formal coaching and counseling process with regard to Plaintiff's absenteeism.[17]  On July 14, 2013, Plaintiff emailed Graham to advise that she had decided to apply for FMLA leave "as a temporary measure," and that she was

---

[17]Doc. 40, Ex. 9.

working closely with her doctor to adjust "maintenance medicines" to see if that would help.[18]

Plaintiff submitted her initial application for FMLA leave the next day.  On July 18, 2013,

BNSF's Human Resources Benefits Processing Team issued Plaintiff a letter approving her for

intermittent FMLA leave from July 15 to August 28, 2013, authorizing her to miss a portion of a

workday two to three days per week.[19]  The letter stated that when the need for leave is

unforeseeable, Plaintiff must provide notice as soon as practicable.  In such instances, it will

generally be considered practicable for you to provide notice of the need for leave within the

time and in accordance with the applicable procedures and policies for requesting time away

from work.  Failure to provide the required notice may result in denial of FMLA leave.[20]

Plaintiff requested FMLA leave due to her bipolar disorder, which she testified was

exacerbated by stress related to personal issues and was affecting her sleeping and waking

patterns and ability to concentrate.  Plaintiff needed FMLA leave in part because she knew that

certain medications she was taking for her condition, specifically Depakote and Ativan,

"tremendously" affected her sleep cycle and her ability to wake up when necessary.  Plaintiff

took Depakote more than once daily and took Ativan on an as-needed basis when she was having

difficulty falling asleep.  In the relevant time frame, Plaintiff took Ativan about four times per

week, and had trouble waking up after taking it two to three times per week.

The Department of Labor publication, Employee Rights and Responsibilities under the

FMLA, states that when an employee's need for leave is not "foreseeable," the employee must

provide notice of the need for such leave "as soon as practicable and generally must comply with

---

[18]*Id.* Ex. 10.

[19]*Id.* Ex. 11.

[20]*Id.*

the employer's normal call-in procedures."[21]  Plaintiff was aware that she was required to give

notice to BNSF of her need for FMLA leave as soon as she could, and was also aware that

BNSF's "normal call-in procedures" required employees who were going to be absent or late to

call in prior to the start of their scheduled shift.

On July 19, 2013, Graham issued Plaintiff a memorandum coaching and counseling her

regarding recent absenteeism events, including late arrivals in 2013 on June 11, 13, and 27, and

absences due to illness on June 21 and 26.[22]  Graham noted that during the rolling twelve-month

period, Plaintiff had twenty absenteeism events resulting in 8.5 days of missed work, and noted

that revising her start time from 7:30 to 8:00 a.m. "might accommodate her needs more fully."

Between July 19 and August 28, 2013, the initial period during which Plaintiff had been

approved to take FMLA leave, she used the leave multiple times without incident by calling prior

to the beginning of her scheduled shift, requesting FMLA leave, and having it approved by

WFM.

On August 1, 2013, Plaintiff called in and asked to use a certain amount of FMLA time.

She later realized that she would need more time off that day, and emailed WFM to ask that

BNSF "update" her FMLA time off for the day to more time than originally requested, to three

hours and fifteen minutes.[23]  The next day, Beatty responded to Plaintiff's email and explained

that when Plaintiff requested FMLA leave and provided a time when she would report to work,

she needed to either report by that time or call in before that time to request any additional time

off, or could be "considered AWOL in this situation."  Plaintiff thanked Beatty for the

clarification and indicated she would be mindful of this requirement in the future.

---

[21]*Id.* Ex. 12.

[22]*Id.* Ex. 13.

[23]*Id.* Ex. 15.

Plaintiff's FMLA leave expired on August 28, 2013, and Plaintiff did not apply for additional FMLA leave until October 28, 2013.  During the interim, on October 18, 2013, Plaintiff called WFM before her 7:30 a.m. scheduled starting time and indicated she thought she might be a few minutes late for work.[24]  Plaintiff arrived at work at 7:35 a.m. and asked Graham if she could stay five minutes past the end of her scheduled shift to make up the time.  Plaintiff also asked, "[c]onsidering everything going on . . . and [her] subsequent lack of sleep," whether she could move her starting time from 7:30 a.m. to 8:00 a.m.  Graham approved Plaintiff's request.

On November 12, 2013, Plaintiff and her union representative attended a conference with Justin Ramsdale, Manager of Rules and Procedures in BNSF's Topeka Labor Relations Department, to discuss incidents of excessive absenteeism—either missed days or late arrivals—October 7, 14, 21, and 25, 2013.[25]  Plaintiff was not approved for FMLA leave on these four dates that were the subject of the conference, and BNSF issued a formal reprimand for the incidents of absenteeism.  The formal reprimand was the first of the four progressive disciplinary steps set out in the Clerical Attendance Guidelines.

On November 19, 2013, BNSF approved Plaintiff's request for intermittent medical leave from October 28, 2013 through October 27, 2014.[26]  Plaintiff requested the leave for her bipolar disorder and some other health issues.  Plaintiff's leave was certified for one-day absences, three to four times per week.  Plaintiff took leave a number of times during this period without incident when she contacted BNSF prior to the beginning of her scheduled shift and requested and was approved for such leave.

---

[24]*Id.* Ex. 16.

[25]*Id.* Ex. 17.

[26]*Id.* Ex. 18.

On December 11, 2013, Plaintiff did not report to work by her 8:00 a.m. starting time, nor did she call WFM to request FMLA leave.  About thirty minutes after the start of the shift, WFM attempted to reach Plaintiff by telephone and left her a message.[27]  Plaintiff returned the call, and attempted to utilize "a couple of hours" of FMLA time to cover her late arrival, but WFM informed her the late arrival would be unexcused because she had not contacted WFM prior to the beginning of her shift.  Plaintiff told WFM she would be at work by 11:00 a.m., but did not come in until 12:40 p.m.  Later that day, Plaintiff asked to meet with Graham, and stated she was extremely overwhelmed at work, was concerned about her ability to complete tasks on time, and was afraid of falling behind.  Graham asked what she could do to help Plaintiff, and Plaintiff said she was not sure what Graham could do.  Plaintiff indicated she wanted to work with another garnishment clerk, B.H.V.,[28] to see how she might become more efficient, and also explained that she was working with her doctor to adjust her medication so that she might sleep better.

On December 19, 2013, Plaintiff contacted WFM at 8:12 a.m., twelve minutes after the start of her shift, and stated she would be in to work by 9:00 a.m.  Plaintiff did not report until 10:15 a.m.  On December 23, 2013, Plaintiff contacted WFM nine minutes after the start of her 8:00 a.m. shift, again stating that she would be in to work by 9:00 a.m.  Plaintiff did not report to work that day until 10:40 a.m.  Plaintiff testified that she would sometimes call in after her shift had started because she was not awake prior to the start of her shift, and would fall back to sleep after calling in and stating what time she would arrive.

On December 26, 2013, Plaintiff emailed Jeanne Artzer, a BNSF Human Resources

---

[27]*Id.* Ex. 19.

[28]B.H.V. is referred to only by her initials to protect her privacy interests, as the record in this matter includes confidential medical information.

Manager, asking if she could obtain a form to request an accommodation under the ADA.[29]

Artzer returned Plaintiff's email on January 2, 2014, with information regarding the request form

and how to obtain, complete, and return it.

On January 7, 2014, Ramsdale sent Plaintiff a letter memorializing the recent meeting

between Ramsdale and Plaintiff regarding Plaintiff's responsibility to contact WFM prior to the

start of her shift if she was going to be late or absent.[30]  Ramsdale also informed Plaintiff that if

she informed WFM she would be late, it was her responsibility to report to work by the time she

had indicated, and that if she needed to extend her arrival time, she must contact WFM prior to

the time at which she stated she would arrive; failure to do so may result in discipline.  Plaintiff

told Ramsdale that she believed she should be able to use FMLA leave when she called in after

her shift started or after the time she reported she would arrive to work as an accommodation

under the ADA.

In mid-January 2014, Plaintiff formally requested an ADA accommodation from BNSF,

specifically requesting that BNSF modify its policy to allow her to call in and use FMLA leave

after her shift had already started:

> I am currently on FMLA (intermittent) for issues related to my disability, which
> disrupt my sleep and cause me serious problems waking.  However, FMLA only
> covers this if I am able to call BEFORE the start of my shift, and sometimes
> problems with waking make this impossible for me to do.  . . . Therefore, the
> accommodation I am requesting is for some flexibility with call-in times when
> using FMLA.  When I am unable to wake up, which IS why I have the FMLA,
> then I am not able to call before start of shift, which causes my time to be
> recorded as AWOL.  I understand the need for letting LR know as soon as
> possible when using FMLA, but marking me AWOL for a late call-in—when this
> is exactly why I NEED to use FMLA right now—is not allowing me the benefit
> of using my FMLA as it was intended.[31]

---

[29]Doc. 40, Ex. 20.

[30]*Id.* Ex. 21.

[31]*Id.* Ex. 22.

BNSF offered Plaintiff the opportunity to move her starting time from 8:00 a.m. to 8:30 a.m., given that the majority of her late call-ins were within thirty minutes of the beginning of her shift.  Plaintiff initially rejected this proposed accommodation because she did not want to leave her teenaged daughter home after school for an extended period of time.  Plaintiff also rejected the proposed shift change because "there's no guarantee . . . [she] would be up prior to 8:30 to call in" and "no guarantee [she] wouldn't fall back to sleep [and] miss whatever time [she] told [BNSF she] was going to be there."  Plaintiff agreed that she  requested an accommodation that she be allowed to call in whenever she woke up, whatever time that might be, and that she be able to show up to work when she was alert and able to be at work, no matter what time that might be.  Generally, another individual who was present, including Plaintiff's daughter, could wake Plaintiff up and get her moving in the morning, but she did not want to burden her daughter.

Later in January 2014, Plaintiff spoke with Artzer about her requested accommodation.[32] Plaintiff told Artzer that her condition was affecting her focus at work, that she was not meeting the expectations of her job, and that she often fell behind and had to ask for help.  Plaintiff also indicated to Artzer that she was not waking up on time because she was having trouble sleeping at night.  Artzer asked Plaintiff if she could call in to report a potential absence or late arrival when she found herself up during the night, but Plaintiff said she was "foggy" at that time and therefore did not call in.

On February 12, 2014, following a January 27 investigation afforded Plaintiff under the collective bargaining agreement between BNSF and Plaintiff's union, BNSF determined Plaintiff had violated two Employee Safety Rules and issued Plaintiff a ten-day record suspension for her

---

[32]*Id.* Ex. 23.

absenteeism on December 11, 19, and 23, 2013.[33]

On February 27, 2014, Plaintiff reported to work one hour after the beginning of her scheduled 8:00 a.m. shift, and was allowed to use FMLA leave for the missed hour.[34]  Ramsdale emailed Plaintiff later that day and informed her that "going forward," she would not be allowed to use FMLA time if she called in after the start of her shift.

On March 3, 2014, following a February 12 investigation, BNSF determined that Plaintiff had violated three Employee Safety Rules and issued Plaintiff a thirty-day record suspension for an incident of absenteeism on January 13, 2014.[35]  On that day, Plaintiff was scheduled to start work at 8:00 a.m. and called in at 8:25 a.m. to report she would be at work by 12:00 p.m. Plaintiff then contacted BNSF at 12:20 p.m. and stated she would not be coming in to work at all that day.

On March 4, 2014, Plaintiff participated in a meeting with Artzer, Graham, and Heather Miller, another BNSF Human Resources Manager, to review and clarify Plaintiff's request for accommodation.[36]  During the meeting, Plaintiff explained that moving her starting time from 8:00 to 8:30 a.m. "was not a good option for" her at that time, and that it was important for BNSF to allow her "flexibility" with regard to her call-in time, specifically that she be permitted to use FMLA leave when she called in after her start time, with a thirty-minute window after her start time to call in.  Miller asked Plaintiff if she could call in the middle of the night when she was aware she was not sleeping.  Plaintiff said she took the same medications every day, but sometimes she was "too groggy" to call in as requested.

---

[33]*Id.* Ex. 24.

[34]*Id.* Ex. 25.

[35]*Id.* Ex. 26.

[36]*Id.* Ex. 27.

On March 5, 2014, Plaintiff met with Graham and Lori Wyre, who supervised Graham, regarding the department's expectations and Plaintiff's responsibility to complete her work in a timely manner.[37]  During the meeting, Graham addressed Plaintiff's failure "to enter/update garnishment documents prior to the scheduled payroll close," which "directly resulted in a failure to deduct the garnishment from the employee's garnishable wages."  Graham also reminded Plaintiff of her "responsibility to enter/update all garnishment documents within the day they are received with the exception of payroll close days," as well as her "responsibility to complete the answer/interrogatories within the legally required timeframe."  Plaintiff acknowledges that she was responsible for entering and updating the garnishment documents in question prior to the scheduled payroll close and that she did not do so, but denies that the garnishment was not deducted from the employee's wages because she believes another garnishment clerk completed the process for her.  Graham also addressed Plaintiff's failure to complete garnishment interrogatories within a legally required timeframe, which she acknowledges she did not do, but believes another clerk obtained the interrogatories and completed them.  The meeting was considered a coaching and counseling and placed in Plaintiff's records.  Plaintiff filed a Charge of Discrimination with the EEOC dated March 5, 2014, the same date as the meeting, alleging discrimination and retaliation under the ADA.[38]

On March 14, 2014, Plaintiff was scheduled to report to work at 8:00 a.m., called in at 8:26 a.m., said she would report to work by 10:30 a.m., then called at 10:36 a.m. and stated she needed to take the rest of the day off.  On March 20, 2014, Plaintiff was scheduled to report to work at 8:00 a.m., WMF contacted her at 8:22 a.m. and left a message, Plaintiff returned the call at 8:31 a.m. and said she would report to work by 10:30 a.m., which she did.

---

[37]*Id.* at 28.

[38]*Id.* Ex. 29.

On March 21, 2014, Artzer sent Plaintiff a letter formally responding to her request for accommodation dated January 13, 2014, as supplemented by the discussions and a meeting with Miller.[39]  BNSF summarized Plaintiff's request as relief from BNSF policies and rules regarding the notice Plaintiff must provide if she will be unable to report to work or will be late to work, specifically, (a) giving Plaintiff flexibility in her start-of-shift/call-in time such that she need not notify BNSF that she will be late to work as long as she expected to be able to report to work within thirty minutes after her scheduled start time; and (b) not considering Plaintiff in violation of BNSF's attendance and call-off rules and policies under such circumstances; and (c) permitting Plaintiff to request FMLA leave after her scheduled start time.  Graham explained that the attendance requirements are governed by a collective bargaining agreement that includes the Clerical Guidelines, noting that with Plaintiff's garnishment clerk position, it was critical for BNSF to rely on her regular and predictable attendance to plan for processing time-sensitive and court-ordered garnishments.  Although it declined to provide the specific accommodation Plaintiff requested, BNSF offered to move Plaintiff's start time from 8:00 to 8:30 a.m., and Plaintiff agreed to the change.

On May 2, 2014, after two April 15 investigations, BNSF concluded that Plaintiff had violated multiple Employee Safety Rules following the two incidents of absenteeism on March 14 and 20, 2014.[40]  As a result, BNSF dismissed Plaintiff from employment effective immediately.

### *Accommodation Provided to B.H.V.*

B.H.V. works in Payroll Garnishment, where there are seven employees inclusive of the supervisor and an off-in-force employee.  B.H.V. has similar duties to Plaintiff.  B.H.V. has

---

[39]*Id.* Ex. 30.

[40]Doc. 50, Exs. 32, 33.

narcolepsy, a sleeping disorder that makes it difficult for her to fall asleep at night and subsequently, difficult to wake up the following morning.  In 2012, B.H.V. requested and was granted an accommodation to address issues related to her disorder.  BNSF agreed to generally provide B.H.V. with one hour of flexibility as to her starting time:  she is allowed to come in after the start of her shift and stay late to finish her work.  BNSF also informed B.H.V. that she could call in prior to the scheduled start of her shift to report any late arrival.   On the majority of occasions B.H.V. has needed to use her accommodation, she has been able to report to work within one hour of her scheduled start time, and estimates that she has been more than one hour late approximately six times per year.  B.H.V. also attempts to contact BNSF prior to the start of her shift to report a late arrival, and estimates she has called in after her shift started five times during the three-plus years she has been accommodated.

## III.    Discussion

### A.  ADA Discrimination

Plaintiff clarifies in her response that her ADA discrimination claim "boils down to" whether BNSF failed to accommodate her request to exempt her from the requirement that she call in prior to the start of her shift if she was going to be late or absent.  The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability."[41]  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[42]  The

---

[41] 42 U.S.C. § 12112(a).

[42] *Id.* § 12112(b)(5)(A).

burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*[43] applies to ADA discrimination claims.[44]  Under this framework, a plaintiff must first establish a prima facie case of failure to accommodate under the ADA by showing that: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired;  and (3) she was discriminated against because of her disability.[45]  Establishing a prima facie case is "not onerous,"[46] and "summary adjudication may be improper when the employee has presented evidence she could perform the essential functions of her position" with the aid of an accommodation.[47]

BNSF does not dispute that Plaintiff's bipolar disorder and ADHD constitutes a disability for purposes of the ADA.  The parties' disagreement focuses on the second element of the prima facie test.  For this element, courts use a two-step inquiry to determine whether a plaintiff is qualified, with or without a reasonable accommodation, to perform the essential functions of the job held or desired:

> First, the court determines whether the individual can perform the essential functions of the job.  Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable [her] to perform those functions.[48]

---

[43]411 U.S. 792 (1973).

[44]*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011).

[45]*Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1188 (10th Cir. 2003)).

[46]*Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quotation omitted).

[47]*Mason*, 357 F.3d at 1124.

[48]*Davidson*, 337 F.3d at 1190 (citation omitted); *see also* 42 U.S.C. § 12111(8) (defining the phrase "qualified individual").

### *Essential Functions of the Job*

Throughout this inquiry, "[t]he plaintiff bears the burden of showing she is able to perform the essential functions of her job."[49]  "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires."[50]  The ADA requires the court to consider "the employer's judgment as to what functions of a job are essential."[51]  "[T]he essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards."[52]

The parties dispute whether regular attendance is an essential function of Plaintiff's former garnishment clerk position.  It is clear from the description of Plaintiff's job duties, BNSF's attendance and disciplinary policies, and the disciplinary actions Plaintiff received, that an essential function of Plaintiff's position was regular and punctual attendance in order to meet the deadlines and time-sensitive nature of the garnishment clerical work.  Indeed, "[a]ttendance is generally an 'essential' function of any job."[53]  Plaintiff counters that on-time attendance is not an essential function of her job, and that her absence or late arrival had no bearing on her work. The record is clear, however, that in this case, the Clerical Attendance Guidelines require "regular, punctual attendance at work."  Plaintiff's erratic attendance pattern caused BNSF difficulty in properly maintaining its business and Plaintiff admittedly struggled to meet the

---

[49]*Mason*, 357 F.3d at 1119; *see U.S. Airways v. Barnett*, 535 U.S. 391, 400 (2002).

[50]29 C.F.R. § 1630.2(n)(1).

[51]*Mason*, 357 F.3d at 1119.

[52]*Id.*

[53]*Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000); *see also Murphy v. Samson Res. Co.*, 525 F. App'x 703, 705–07 (10th Cir. 2013) (because attendance was an essential function of the plaintiff's position, the plaintiff was not a qualified individual within the meaning of the ADA); *Valdez v. McGill*, 462 F. App'x 814, 817–19 (10th Cir. 2012) (same).

expectations of her position.[54]  Although Plaintiff minimizes the importance of her attendance, asserting that other garnishment clerks could cover for her, it is undisputed that she missed several key garnishment deadlines during the relevant period of time.

The weight of authority supports the conclusion that, in a work setting such as is presented here, regular and punctual attendance is a regular function.[55]  Thus, there is no genuine issue of material fact that Plaintiff could not perform the essential functions of her job because she could not fulfill the essential function of punctual and regular attendance.  The Court turns to whether any reasonable accommodation would enable her to perform the essential functions of her job.

### Reasonable Accommodation

To defeat an employer's motion for summary judgment, the employee must first demonstrate that an accommodation appears reasonable on its face.[56]  The burden of production then shifts to the employer to present evidence of its inability to accommodate.[57]  If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence.[58]  Whether an accommodation is reasonable under the ADA is a mixed question of fact and law.[59]

The Tenth Circuit has consistently held that an employee's request to be relieved from an

---

[54]*Davidson*, 337 F.3d at 1191 ("[C]ourts must give consideration to the employer's judgment as to what functions of a job are essential" though "such evidence is not conclusive"); *cf. Solomon v. Vilsack*, 763 F.3d 1, 6 (D.D.C. 2014) (qualified plaintiff was a budget analyst who, despite an erratic schedule, "never missed a single work deadline.").

[55]*Murphy v. Samson Res. Co.*, Nos. 10-cv-694-GKF, 11-cv-274-GKF, 2012 WL 12072010, at * 15 (N.D. Okla. Apr. 10, 2012) (collecting cases).

[56]*Mason*, 357 F.3d at 1122.

[57]*Id.*

[58]*Id.*

[59]*Id.*

essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation.[60] Further, "the ADA does not even require an employer to modify an existing position in order to accommodate a disabled employee."[61]

BNSF argues that Plaintiff's request is unreasonable as a matter of law, characterizing her request as being allowed to call in to report an absence or late arrival whenever she woke up, however late that might be, and that she then be allowed to extend her arrival time indefinitely. Plaintiff counters that she merely requested BNSF to grant her a flexible work schedule, allowing a start time of 8:30 a.m. with a half-hour window to call in to report a late start time or absence.   But the record shows that Plaintiff initially rejected the offer of an 8:30 a.m. start time months before her termination, and asked for more than a thirty-minute grace period.  The record also belies Plaintiff's claim that BNSF did not offer the later start accommodation until the eve of her termination; instead, BNSF always offered Plaintiff the opportunity to work with her managers to move her start time to 8:30 a.m. and in mid-January 2014, nearly four months before her termination, BNSF expressly offered her the 8:30 a.m. start time.

The Court finds that Plaintiff wanted BNSF to dispense with the punctual attendance requirement and allow the frequent and unpredictable effect of her medication to dictate her work schedule.  Plaintiff testified that she was asking to be permitted to call in to report an absence or late arrival whenever she woke up, however late that might be, and then be allowed to extend her arrival time indefinitely.  Although she took her Depakote medication daily, she was unable to testify to how often it affected her sleep, requiring her to take the Ativan medication that on occasion caused her to oversleep the next morning.   In light of the time sensitive nature

---

[60]*Id.* at 1122–23 (collecting cases).

[61]*Id.* (citing *Martin v. Kansas*, 190 F.3d 1120, 1133 (10th Cir. 2001), *overruled on other grounds, Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001)).

of Plaintiff's garnishment clerical work, coupled with the attendance requirements of BNSF for clerical employees, the Court finds Plaintiff has failed to demonstrate the requested accommodation is reasonable on its face.[62]  As explained above, Plaintiff's punctual and regular attendance in the garnishment clerk department is an essential function of her position.  Although the ADA provides for part-time or modified work schedules as a reasonable accommodation,[63] the ADA does not require BNSF to eliminate or change the essential functions of the garnishment clerk position in order to accommodate Plaintiff's disability.[64]

Plaintiff points to the scheduling accommodations provided to B.H.V., another garnishment clerk, to bolster her claim that her request was reasonable.  The Court is not persuaded.  The fact that BNSF provided an accommodation to one employee does not mean that it was inherently unreasonable to not do so for Plaintiff.[65]  Moreover, the record shows that B.H.V. requested a limited window in which to call in to report to work, as compared to the open-ended call-in and start times requested by Plaintiff.  Rather than arriving to work within a one-hour window after her scheduled start time, like B.H.V., Plaintiff's call-in and arrival time was varied and unpredictable.  Thus, Plaintiff's requested accommodation is, as a matter of law,

---

[62]*See Crowell v. Denver Health & Hosp. Auth.*, 572 F. App'x 650, 659 (10th Cir. 2014) (finding "an unpredictable, flexible schedule that would permit [an employee] to leave work whenever she has a medical episode is unreasonable as a matter of law"); *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1240 (9th Cir. 2012) (recognizing that an accommodation allowing an employee "to simply miss work whenever she felt she needed to and apparently for so long as she felt she needed to" is "not reasonable on its face.") (citation omitted); *Doak v. Johnson*, 798 F.3d 1096, 1106 (D.D.C. 2015) (holding plaintiff's requesting accommodation was unreasonable because co-workers "had to step in to pick up the slack . . . due to [the plaintiff's] frequent and unpredictable absences and late arrivals."); *Thompson v. Cendant Corp.*, 130 F. Supp. 2d 1255, 1250 (N.D. Okla. 2001) (holding employee's "request that [employer] accommodate her by granting unpredictable absence from work is not a reasonable accommodation as required by the ADA"); *Murphy v. Samson Res. Co.*, Nos. 10-cv-694-GKF, 11-cv-274-GKF, 2012 WL 1207210, at *16 (N.D. Okla. Apr. 10, 2012) (concluding request for flexible schedule that would excuse employer's punctual attendance requirement was unreasonable, in light of time sensitive nature of the employee's position).  *Cf. Solomon v. Vislack*, 763 F.3d 1, 6 (D.D.C. 2014) (finding plaintiff was a budget analyst who, despite an erratic schedule, "never missed a single work deadline.").

[63]42 U.S.C. § 12111(9)(B).

[64]*See Mason*, 357 F.3d at 1124.

[65]*See Smith v. Ameritech*, 129 F.3d 857, 867–68 (6th Cir. 1997) (citing *Traynor v. Turnage*, 485 U.S. 535, 549 (1988) (discussing ADA counterpart Rehabilitation Act)).

unreasonable.  Because Plaintiff failed to establish a prima facie case of discrimination under the ADA, summary judgment is granted on this claim.

### B.  FMLA

Plaintiff contends that BNSF interfered with her ability to take FMLA leave by declining her requests for such leave when she called to report late arrivals after the beginning of her shift.

The FMLA guarantees eligible employees substantive rights of up to twelve weeks of unpaid leave for serious health conditions and reinstatement to their former position or an equivalent position upon return from that leave.[66]  Under § 2615(a)(1), an employer may not interfere with, restrain, or deny the existence of or the attempt to exercise any rights under the FMLA.[67]  To prevail on an interference claim under the FMLA, a plaintiff must demonstrate that (1) she was entitled to FMLA leave; (2) some adverse action by the employer interfered with that right to take FMLA leave; and (3) the employer's action was related to the exercise or attempted exercise of his FMLA rights.[68]  "Under this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent."[69]

### 1.  Whether Plaintiff was Entitled to FMLA Leave

BNSF asserts that as a matter of law, Plaintiff cannot prove the first element because in order to show that she was entitled to FMLA leave, Plaintiff must prove that she gave adequate notice.  Regarding notice under the FMLA, federal regulations differentiate between "foreseeable" and "unforeseeable" leave.[70]  When the need for FMLA leave is foreseeable,

---

[66]*See* 29 U.S.C. §§ 2612(a)(1), 2614(a).

[67]*See* 29 U.S.C. § 2615(a)(1).

[68]*DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009).

[69]*Id.* (internal quotations and citation omitted).

[70]*See* 29 C.F.R. §§ 825.302 and 825.303.

employees must give thirty days advance notice.[71]  In addition, with regard to any changes in

dates or scheduled leave, an employee must notify the employer "as soon as practicable."[72]  The

regulation defines that phrase as follows:

> "As soon as practicable" means as soon as both possible and practical, taking into
> account all of the facts and circumstances in the individual case.  For foreseeable
> leave where it is not possible to give as much as 30 days notice, "as soon as
> practicable" ordinarily would mean at least verbal notification to the employer
> within one or two business days of when the need for leave becomes known to the
> employee.[73]

Where an employee contends the need for leave was unforeseeable, an employee should give

notice "as soon as practicable under the facts and circumstances of the particular case."[74]

BNSF asserts that Plaintiff knew that BNSF required her to request FMLA leave prior to

the commencement of her shift, that she took medication multiple days per week, and that she

knew her medication more often than not caused her to oversleep.  BNSF contends that as a

matter of law, Plaintiff should have contacted BNSF when she found herself up in the middle of

the night after realizing she was unable to fall asleep, and by not doing so, Plaintiff disregarded

her responsibility to provide advance notice of her need for FMLA leave.

In support of its position, BNSF cites to *Valdivia v. BNSF Ry. Co.*[75]  In that case, the

Plaintiff, who suffered from migraines and had been certified for intermittent FMLA leave, was

disciplined after he failed to call in prior to his shift to report an absence that he claimed should

have been protected.[76]  The court rejected plaintiff's claim, finding that he knew of his potential

need for FMLA leave when he took a second dose of medication that he knew sometimes caused

---

[71]29 C.F.R. § 825.302(a).

[72]*Id.*

[73]29 C.F.R. § 825.302(b).

[74]29 C.F.R. § 825.303(a).

[75]No. 07-2467-KHV, 2009 WL 352604 (D. Kan. Feb. 12, 2009).

[76]*Id.* at *4.

him to experience "grogginess or a hangover effect," and which had previously caused him to sleep through his alarm.[77]  BNSF argues that like the plaintiff in *Valdivia*, Plaintiff was aware that when she found herself sleepless in the night and took her second medication, she should have called in to request FMLA leave for the following morning's shift.

While BNSF correctly summarizes the court's findings in *Valdivia*, the Court notes a critical distinction:  that decision was made after defendant's motion for summary judgment was denied and the court conducted a bench trial.[78]  Accordingly, the Court finds that this case is in a similar posture to the earlier *Valdivia* decision, where the court determined that the evidence presented a genuine issue of material fact as to whether the plaintiff's need for FMLA leave was unforeseeable and he provided notice as soon as practicable under the circumstances.[79]  In this case, the issue also comes down to whether the need for FMLA leave was foreseeable at the time Plaintiff took her medication, and, if so, whether Plaintiff gave notice as soon as practicable under the facts and circumstances of this case.  Plaintiff contends that she cannot foresee when her medication will cause her to oversleep, and that she is too groggy in the middle of the night to call in to BNSF regarding her morning shift.  Plaintiff further testified that she could only rely on her daughter to wake her, but she did not want to burden her daughter with that responsibility, that she shared custody of her daughter with her husband and she was not always with Plaintiff in the morning, and it was possible that Plaintiff would fall back to sleep, regardless of whether her daughter had woken her up.  Accordingly, the Court finds that there remains a genuine issue of material fact as to this issue and BNSF is not entitled to summary judgment on this ground.

---

[77] *Id.* at * 2, 6.

[78] *Id.* at *1.

[79] *Valdivia v. BNSF Ry. Co.*, No. 07-2467-KVH, 2008 WL 4499978, at *6 (D. Kan. Sept. 30, 2008).

### 2.  Whether BNSF's Action was Related to the Exercise or Attempted Exercise of FMLA Rights

Likewise, the evidence presents a genuine issue of material fact whether Plaintiff was entitled to FMLA leave for the days where she called in after the start of her shift.  If so, BNSF interfered with such right by refusing FMLA leave and disciplining and ultimately terminating her for her tardiness and absences.  Summary judgment is denied on Plaintiff's FMLA interference claim.

### C.  Retaliation

Plaintiff claims that BNSF retaliated against her after she filed her charge of ADA discrimination against the Company in March 2014.   The elements of a retaliation claim are: (1) the employee "engaged in protected opposition to discrimination"; (2) the employee suffered an adverse action during or after his opposition, which a reasonable employee would have found to be materially adverse (meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); and (3) there was a "causal connection . . . between the protected activity and the materially adverse action"[80]  Plaintiff's retaliation claim is analyzed under the *McDonnell Douglas* burden shifting framework.[81]   Under this evidentiary framework, the plaintiff must first establish a prima facie case of retaliation.[82]  If the plaintiff does so, the burden then shifts to the defendant "to give a legitimate, nondiscriminatory reason for its employment decision."[83]  "If the employer comes forward with

---

[80]*Nyanjom v Hawker Beechcraft Corp.*, —F. App'x—, 2016 WL 336032, at *3 (10th Cir. Jan. 28, 2016) (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 & n.4 (10th Cir 2007) (internal quotation marks omitted)).

[81]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999).

[82]*Id.*

[83]*Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (citation omitted).

a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual–i.e., unworthy of belief."[84]  "A plaintiff who demonstrates pretext gets over the hurdle of summary judgment."[85]

### Causal Connection

The Tenth Circuit has found a causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[86]  Courts typically consider "protected conduct *closely followed by* adverse action" as sufficient evidence.[87]  "In order to make a prima facie case, one must only introduce evidence from which an inference can be drawn that an employer would not have taken the adverse action had the employee not filed prior discrimination charges."[88] Ultimately, the burden of establishing a prima facie case is not onerous, but "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[89]  Finally, the Supreme Court has clarified that a Title VII plaintiff asserting a claim of retaliation must show that her protected activity was the but-for cause of the alleged adverse employment action, and not merely a motivating factor.[90]  The

---

[84]*Id.* (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[85]*Id.* (internal quotation marks and citation omitted).

[86]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[87]*Id.* (emphasis added).

[88]*Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[89]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming grant of summary judgment to employer because "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings.").

[90]*Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Tenth Circuit has not determined whether an ADA retaliation claim requires "but for" or "motivating factor" causation.[91]

Plaintiff contends that a March 5, 2014 coaching and counseling session from her supervisor regarding attendance and performance issues was carried out in retaliation for filing a Charge of discrimination.  BNSF argues that Plaintiff cannot meet the causation element of her prima facie claim because the March 5 session occurred before BNSF could have known she had made such a filing.  The copy of the Plaintiff's Charge in the record before the Court shows that it was signed and filed with the EEOC on March 5, the same day the session occurred, and the formal Notice issued by the EEOC regarding Plaintiff's Charge is dated March 11, 2014, nearly a week later.[92]  "Evidence of the acting party's knowledge is essential to establishing a causal connection between the adverse action and the protected activity."[93]  Thus, BNSF argues, without such knowledge, no inference of causation is possible.[94]

Plaintiff cites to a letter from the EEOC dated March 4, 2014, suggesting notice of her Charge was provided to BNSF before she signed the formal paperwork on March 5.[95]  In the letter, EEOC Investigator Samuel James asks that Plaintiff return a signed copy of her charge of discrimination against BNSF.  The letter further states that "[b]ecause the document that you submitted to us constitutes a charge of discrimination, we have complied with the law and notified the employer that you filed a charge."  James also signed the Notice dated March 11, 2014, and that Notice, which included a copy of the Charge of Discrimination, is the only Notice

---

[91]*See Doe v. Bd. of Cty. Comm'rs*, 613 F. App'x 743, 747 n.3 (10th Cir. 2015) (unpublished) (noting that several courts have applied the "but for" causation standard in assessing ADA claims).  Because the Court concludes that Plaintiff cannot prevail even under the lower motivating factor standard, it will assume it applies.

[92]Doc. 40, Ex. A at 29, Ex. C.

[93]*Hinson v. Molix*, 187 F. Supp. 2d 1297, 1311 (D. Kan. 2002).

[94]*Id.*

[95]Doc. 51, Ex. B.

in the record before the Court.  Plaintiff's suggestion that the notification referenced in the

March 4 letter was issued before March 4 or received by BNSF before March 5, is purely

speculative and does not create an issue of fact.[96]

Moreover, even if BNSF officials had knowledge that Plaintiff had contacted the EEOC

prior to March 5, she cannot show that her Charge was a motivating factor for the counseling

session.   The record is clear that BNSF had addressed Plaintiff's absenteeism issues on multiple

occasions prior to any Charge being filed.  Specifically, Plaintiff had been subject to a formal

coaching and counseling in July 2013, a formal reprimand in November 2013, a ten-day record

suspension in February 2014, and a twenty-day record suspension on March 3, 2014.  Evidence

that the employer had concerns about a problem before an employee engaged in the protected

activity undercuts the temporal proximity.[97]  The relationship between the timing of Plaintiff's

Charge and the March 5 counseling session has a causal explanation that hurts, rather than helps

Plaintiff's case:  pursuant to the progressive discipline procedures governing attendance issues

for clerical employees, Plaintiff had exhausted all but the final step of dismissal before she filed

her Charge.  Summary judgment is granted on Plaintiff's retaliation claim.[98]

### D.  FRSA

Plaintiff seeks protection under 49 U.S.C. § 20109(c), which states in relevant part:

(c) Prompt medical attention. –
(1) Prohibition. – A railroad carrier or person covered under this section may not
deny, delay, or interfere with the medical or first aid treatment of an employee
who is injured during the course of employment. . . .

---

[96]*Beams v. Norton*, 93 F. App'x 211, 212 (10th Cir. 2004) ("Unsupported conclusory allegations do not create an issue of fact.").

[97]*Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002).

[98] A request for accommodation can also constitute protected activity under the ADA, if the plaintiff reasonably believed she was entitled to an accommodation.  *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1194 (10th Cir. 2007).  Although her Charge asserts that she was retaliated against for requesting an ADA accommodation, Plaintiff does not assert a claim of retaliation on this basis.

> (2) Discipline.– A railroad carrier . . . may not discipline, or threaten discipline to, an employee for requesting medical or first aid treatment, or for following orders or a treatment plan of a treating physician. . .[99]

In order for Plaintiff to prevail on her retaliation claim under the FRSA, she must show: (1) she engaged in a protected activity; (2) BNSF knew that she engaged in protected activity; (3) she suffered an adverse action; and (4) the protected activity was a contributing factor to the unfavorable personnel action.[100]   BNSF contends that Plaintiff was not "engaged in protected activity" under the FRSA because § 20109(c) only applies to cases involving work-related injuries or illnesses.

In support, BNSF cites the recent Third Circuit decision in *Port Authority Trans-Hudson Corp. v. Secretary of Labor ("PATH")*.[101]   In that case, the court analyzed the statutory text of the FRSA, concluding the language "affirmatively supports the conclusion that subsection (c)(2) is limited to addressing on-duty injuries."[102]   Unlike subsection (c)(1) of the FRSA, subsection (c)(2) does not explicitly limit its protections to treatment plans for injuries sustained "during the course of employment."   The issue before the Third Circuit in *PATH* was whether the "treatment" referred to in subsection (c)(2) refers back to the "treatment" in subsection (c)(1), thereby incorporating the "during the course of employment" limitation into subsection (c)(2).[103] The court concluded that subsection (c)(2) applies only to orders or treatment plans related to injuries that, as in subsection (c)(1), are sustained "during the course of employment."[104]   The

---

[99]49 U.S.C. § 20109(c).

[100]*See* 49 U.S.C. § 20109(d)(2)(A)(i); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014).

[101]776 F.3d 157 (3d Cir. 2015).

[102]*Id.* at 162–63.

[103]*Id.* at 162.

[104]*Id.*

court rejected the plaintiff's argument that subsection (c)(2) prevented his employer from disciplining him for following a treatment plan that stemmed from an off-duty injury.[105]

Plaintiff urges the Court to reject the reasoning in PATH and find § 20109(c)(2) ambiguous, thus providing Chevron deference to the underlying Department of Labor Administrative Review Board ("ARB") decision in *Bala*, where the ARB determined the phrase "protected activity" in subsection (c)(2) also referred to non-work-related activity.[106]  However, the PATH court expressly rejected the Department of Labor's claim that the ARB's interpretation is entitled to Chevron deference, as the interpretation of the statutory subsections "is a pure question of statutory construction for the courts to decide."[107]  The court concluded that the ARB misinterpreted the statute in *Bala* and reversed.[108]  Accordingly, *Bala* is a non-precedential, reversed agency decision and is thus not entitled to Chevron deference.[109]

The Court adopts the reasoning of the Third Circuit, and concludes that subsection (c)(2) is limited to addressing on-duty injuries.  Here, Plaintiff took medication as part of her doctor's plan for treatment of her bipolar disorder and ADHD, and her sleep disorder was the consequence of following her doctor's orders.  Plaintiff does not assert, however, that her bipolar disorder, ADHD, and medication-induced sleep disorder were in any way work-related impairments.  Thus, Plaintiff did not engage in protected activity under the FRSA, and BNSF is granted summary judgment on this claim.[110]

---

[105]*Id.* at 159.

[106]ARB No. 12-048, ALJ Case No. 2010-FRS-026 (Sept. 27, 2013).

[107]*PATH*, 776 F.3d at 169 (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S.421, 446 (1987)).

[108]*Id.*

[109]*See Carpio v. Holder*, 592 F.3d 1091, 1097 (10th Cir. 2010).

[110]The Court does not reach BNSF's alternative argument, that Plaintiff's FRSA claim is barred by the election of remedies provision found in 49 U.S.C. § 20109(f) because she availed herself of "another provision of law" for the same allegedly unlawful act of the railroad carrier, specifically the ADA and FMLA.

**E.  Kansas Public Policy**

In her response, Plaintiff  expressly abandons her state law public policy claim,[111] and therefore, summary judgment is granted on this claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant BNSF's Motion for Summary Judgment (Doc. 40) is **granted** with respect to Plaintiff's ADA, retaliation, FRSA, and state law claims, and **denied** with respect to Plaintiff's FMLA interference claim.

**IT IS SO ORDERED.**


Dated: <u>May 17, 2016</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[111]Doc. 51 at 34.